

**SIGNED this 10 day of March, 2015.**

_____

**James P. Smith**
**Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | Case No. 13-30083-JPS |
| R. SCOTT APPLING, | : | |
| CONNIE F. APPLING, | : | |
|      Debtors | : | |
| | : | |
| LAMAR, ARCHER & COFRIN, LLP, | : | |
|      Plaintiff | : | |
| | : | Adversary Proceeding |
| v. | : | No. 13-3042 |
| | : | |
| R. SCOTT APPLING, | : | |
|      Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

   For Plaintiff:     Bruce B. Weddell
              Burbage & Weddell, L.L.C.
              100 Colony Square, Suite 1825
              Atlanta, Georgia 30361

              David W. Davenport
              Lamar Archer & Cofrin LLP
              50 Hurt Plaza
              Suite 900
              Atlanta, GA 30303

   For Defendant:    Daniel L. Wilder
              Emmett L. Goodman, Jr. LLC
              544 Mulberry Street, Suite 800
              Macon, Georgia 31201

2

## MEMORANDUM OPINION

This is an adversary proceeding in which Plaintiff seeks to have its claim against

Debtor R. Scott Appling[1] determined nondischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(A).  As originally pled in its complaint, Plaintiff contended that when Debtor

promised to use an anticipated tax refund to pay legal fees owed to Plaintiff, he committed

fraud because he, in fact, never intended to do so.  However, at trial, Plaintiff amended its

contentions to allege that Debtor lied about when an amended tax return had been prepared

and the amount of the refund, and then subsequently lied about not having received it.[2]

The matter was tried on September 18 and 23, 2014.  At the conclusion of the trial,

the Court requested that the parties submit their closing arguments in writing.  By consent of

the parties, the written arguments were delayed until a transcript of the trial was obtained.

The transcript has now been prepared and filed and the final brief was filed in the case on

January 21, 2015.  Having considered the testimony and exhibits introduced at trial, the

arguments of counsel and the law, the Court now publishes its findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

In 2002, Debtor was a mortgage loan originator who earned $270,922.  In July 2003,

---

[1]  Plaintiff does not hold a claim against codebtor Connie F. Appling and she is not a party to this adversary proceeding.

[2]  Pursuant to Bankruptcy Rule 7015, Rule 15 F.R.Civ.P. applies in adversary proceedings.  Rule 15(b)(2) provides, in part, "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."

he began working for a bank earning $3,000 per month.  In June 2004, Debtor purchased a

business and quit his bank job.  He soon discovered his new company had serious financial

problems the prior owners had allegedly failed to disclose.  With a large debt payment to the

sellers approaching, Debtor decided to seek legal advice.

In July 2004, Debtor retained Plaintiff law firm to represent him and his company in

an attempt to rescind the purchase of the company from its prior owners on the grounds that

the financial condition of the company had been misrepresented.  Debtor agreed to pay

Plaintiff on an hourly basis, with invoices for fees and costs to be paid monthly.  Walter

Gordon, a sole practitioner in Hartwell, Georgia, was retained as local counsel on a similar

fee basis.  Thereafter, litigation against the prior owners and other defendants ensued in the

Superior Court of Franklin County, Georgia.

By March 2005, Debtor had run up a sizeable unpaid amount of fees and costs to

both Plaintiff and Mr. Gordon.  Debtor owed Plaintiff approximately $60,800 and Mr.

Gordon approximately $18,000.  A conference was scheduled in Mr. Gordon's office in

Hartwell, Georgia, to discuss the status and prospects of the litigation and how the fees

could be brought current.  Prior to the meeting, Debtor sent an email to David Davenport, a

partner at Plaintiff law firm who was handling Debtor's case, complaining about the fees

and costs being incurred in the litigation, the lack of progress in the litigation and

concluding with a derogatory joke about lawyers.  Robert Lamar, a partner at Plaintiff law

firm who was in charge of Debtor's account at the firm, responded by letter in which Mr.

Lamar gave his analysis of the status of the litigation, his response to the complaints about

the fees and costs and advised Debtor that if the fees and costs were not brought current, the

firm would withdraw from representation and place an attorney's lien on all work product until the fees and costs were paid.[3]

The meeting occurred on March 18, 2005.  At the meeting, Plaintiff contends that Debtor represented that his accountant had prepared an amended tax return and that he would receive a tax refund of approximately $100,000, which would be enough to pay current and future fees.  Plaintiff asserts that, in reliance on these representations, Plaintiff continued to represent Debtor and did not begin collection of its fees.

The litigation was thereafter settled in stages, with settlements with each of the defendants occurring at different times.  The settlements reduced Debtor's remaining financial obligations to the defendants.  All matters relating to the litigation and settlement were concluded by March 2006.

On June 15, 2005, Debtor and his wife signed an amended tax return for the 2002 tax year for the refund in question.  However, rather than a refund of approximately $100,000, the amended return sought a refund of only $60,718.  This amount was further reduced by the IRS in October 2005 to $59,851.[4]  The evidence establishes that Debtor received a check for this amount prior to November 2005.  Debtor did not pay any of the refund to Plaintiff or Mr. Gordon.

Plaintiff and Debtor had another meeting on November 2, 2005, to discuss the

---

[3]  In Georgia, an attorney has a lien on all papers of their client in their possession until all fees and costs for services rendered are paid.  O.C.G.A. § 15-19-14(a).

[4]  Although Debtor testified that both his 2002 and 2003 returns were amended, the only amended return introduced at trial was the 2002 amended return.  Further, there was no testimony or other evidence that Debtor received any refund other than the refund for 2002. Accordingly, the Court concludes that the 2003 return was not amended.

outstanding fees and the firm's willingness to continue with the representation, as well as filing a new law suit against a party involved in Debtor's purchase of the business who had not been sued in the original litigation.  Plaintiff alleges that Debtor again made representations regarding the tax refund and, in reliance thereon, Plaintiff agreed to complete the pending litigation and forego immediate collection of the fees.  However, Plaintiff refused to undertake any additional representation.

Ultimately, in June 2006, Plaintiff and Mr. Gordon allegedly learned Debtor had received and spent the refund in his business and would not use the refund to pay their fees. Plaintiff filed suit against Debtor for the unpaid fees and costs and received a judgment in October 2012 in the Superior Court of Hart County, Georgia for $104,179.60.  Debtor and his wife filed Chapter 7 bankruptcy in January 2013.

Plaintiff asserts that Debtor made misrepresentations about the tax refund at both the March and November 2005 meetings.  Plaintiff contends that it justifiably relied on these representations and continued to represent Debtor and forego collection of its fees. Accordingly, Plaintiff contends its claim of $104,179.60, evidenced by the judgment from the Superior Court of Hart County, Georgia, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## <u>DISCUSSION</u>

Plaintiff has the burden of proving by a preponderance of the evidence that the claim is nondischargeable.  <u>Grogan v. Garner</u>, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991).  If Plaintiff fails to prove any of the elements of the claim:

...the debt is dischargeable.  Moreover, courts generally

> construe the statutory exceptions to discharge in bankruptcy
> "liberally in favor of the debtor," and recognize that "'[t]he
> reasons for denying a discharge...must be real and substantial,
> not merely technical and conjectural.'" In re Tully, 818 F.2d
> 106, 110 (1st Cir. 1987) (quoting Dilworth v. Boothe, 69 F.2d
> 621, 624 (5th Cir. 1934)); see also, Boyle v. Abilene Lumber,
> Inc., (Matter of Boyle), 819 F.2d 583, 588 (5th Cir. 1987).
> This narrow construction insures that the "honest but
> unfortunate debtor" is afforded a fresh start.  Birmingham
> Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir.
> 1985)...

Equitable Bank v. Miller ( In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

11 U.S.C. § 523(a)(2)(A) bars in relevant part, the discharge of debts for services or

an extension or renewal of credit resulting from "false pretenses, a false representation, or

actual fraud...."

> The elements of a claim under § 523(a)(2)(A) are: the debtor
> made a false statement with the purpose and intention of
> deceiving the creditor; the creditor relied on such false
> statement; the creditor's reliance on this false statement was
> justifiably founded; and the creditor sustained damage as a
> result of the false statement.

Johannessen v. Johannessen, 76 F.3d 347, 350 (11th Cir. 1996).

A fraudulently induced forbearance from collection constitutes an extension of credit

for purposes of 11 U.S.C. § 523(a)(2)(A).  Ojeda v. Goldberg, 599 F. 3d 712, 718 (10th Cir.

2010); Foley & Lardner v. Biondo (In re Biondo), 180 F. 3d 126, 132-33 (4th Cir. 1999);

Wolf v. Campbell (In re Campbell), 159 F. 3d 963, 966 (6th Cir. 1998); Field v. Mans, 157

F. 3d 35, 43 (1st Cir. 1998).  Further:

> 'As distinguished from false representation, which is an
> express misrepresentation[,] false pretense involves an implied
> misrepresentation or conduct intended to create and foster a
> false impression,' Minority Equity Capital Corp. v. Weinstein

> (In re Weinstein), 31 B.R. 804, 809 (Bankr. E.D. N.Y. 1983),
> and '[i]t is well recognized that silence, or the concealment of
> a material fact, can be the basis of a false impression which
> creates a misrepresentation actionable under § 523(a)(2)(A),'
> id.; see also, e.g., Citizens & S. Nat'l Bank v. Thomas (In re
> Thomas), 12 B.R. 765, 768 (Bankr. N.D. Ga. 1981) ('A
> debtor's silence may amount to a materially false
> representation prohibiting discharge of the indebtedness.').

SunTrust Bank v. Brandon (In re Brandon), 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002).

> Because direct proof of intent (i.e., the debtor's state of mind)
> is nearly impossible to obtain, the creditor may present
> evidence of the surrounding circumstances from which intent
> may be inferred.

Caspers v. Van Horne (Matter of Horne), 823 F.2d 1285, 1287 (8th Cir. 1987), abrogated on

other grounds by Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d. (1991).

False Statement Made With Intention To Deceive

The March 18, 2005 Meeting

By letter dated March 9, 2005, Mr. Lamar advised Debtor that unless the fees owed

to Plaintiff and Mr. Gordon were brought current promptly, the firms would withdraw from

the representation and place an attorney's lien on all of their work product.  The evidence

establishes that Debtor understood that the trial of his state court litigation was to take place

within the next few months.

Debtor testified that he called his accountant, Mike Strickland, CPA, before the

meeting to discuss possible sources of cash.  According to Debtor, Strickland told him the

IRS allowed recouping of losses from the business against taxes previously paid and

8

inquired about Debtor's 2002 and 2003 income.[5]  At one point in his testimony, Debtor testified that he told Strickland his income for 2002 was $295,000 and that Strickland calculated that, based on a 28 percent tax rate, Debtor would have paid taxes of over $100,000.  Based on this calculation, he testified that Strickland told him he could get a tax refund for that approximate amount.  At another point in his testimony, Debtor testified that he used his last paycheck from 2002[6] to provide Strickland with his income, then provided his wife's income and his 2003 income and Strickland estimated the taxes paid and potential refund at $104,000 to $105,000.  Debtor testified that at the March meeting he told Mr. Lamar and Mr. Gordon that, based on Strickland's advice, there was a possibility he would receive a $100,000 refund and, if he got that amount, he could pay their bills.

Mr. Lamar testified that Debtor told them that the amended return had been prepared, was ready for filing, and that he would be getting $100,000 back, which he would use to pay their fees.  Mr. Gordon testified that Debtor told them he felt like the refund would be approximately $100,000 and that he would use the money to pay their fees.  However, Mr. Gordon testified that, "I'd asked him if he had the return.  I don't think it had been prepared at that point."[7]

Plaintiff contends that Debtor's representations regarding the possible tax refund

---

[5]  The evidence suggests that Mr. Strickland did not prepare these returns.  Debtor was referred to and retained Strickland in June 2004, which would be after these returns were due.  Transcript, Sept. 18, 2014, page 135.

[6]  At another point, Debtor testified that he used his 2002 W-2 form to provide Strickland with this information.  The difference in the testimony is not material since both forms would have disclosed the same information regarding income and taxes withheld.

[7]  Transcript, Sept. 18, 2014, page 17.

9

were false for two reasons. First, Plaintiff contends that Debtor falsely represented that the amended return had been prepared and was ready to file. Secondly, Plaintiff contends that Debtor knowingly lied about the refund amount because Debtor knew the refund would not be approximately $100,000.

As for the alleged misrepresentation that the amended return had been prepared by the March 18, 2005 meeting, the evidence is conflicting. The evidence establishes that the return had, in fact, not been prepared by that time. Mr. Lamar testified that Debtor represented that it had. Both Debtor and Mr. Gordon testified that no such representation was made. In light of the fact that Mr. Gordon has no financial interest in this litigation (and even if he did, his testimony would be adverse to that interest), the Court is inclined to accept his version of facts and finds that Plaintiff has failed to prove by a preponderance of the evidence that Debtor represented at the March meeting that the amended return had already been prepared.

However, the Court does find that Plaintiff has carried its burden to prove that Debtor knowingly made a false representation with intent to deceive when he represented that the refund would be approximately $100,000. As stated, Debtor gave two slightly different versions of his conversation with Strickland. In the first version, he testified that he reported to Strickland his 2002 income of $295,000 and his 2003 income of $18,000, a total of $313,000. If Strickland assumed a tax rate of 28 percent, as Debtor testified, the taxes on $313,000 income would be $87,640. The Court does not believe that an experienced CPA would have told Debtor, based on these numbers, that the taxes paid (and thus the amount eligible for refund) would have been approximately $100,000.

10

In the second version, he testified that he gave Strickland his 2002 income of

$260,000 from either his last paycheck or his 2002 W-2 form.  He then added his wife's

income for 2002 and 2003 and his 2003 income, and from this information, Strickland came

up with taxes (and thus a potential refund) of $104,000 to $105,000.  From the 2002

amended return, we know that Debtor and his wife's adjusted gross income for 2002 was

$296,325, on which they paid taxes of $68,190.  Debtor and his wife's total income in 2003

was at most $60,000.[8]  Assuming a 28 percent tax rate, taxes on the 2003 income would

have been $16,800.  Thus, the total taxes paid by Debtor and his wife in 2002 and 2003 was

only $84,990.  It is simply not plausible to believe that Strickland, with this information,

would have told Debtor that his taxes and potential refund would be between $104,000 and

$105,000.

Accordingly, the Court does not believe Debtor's testimony that he honestly thought

that he would receive a refund of approximately $100,000.  Rather, the Court finds that

Debtor knowingly misrepresented the amount of the tax refund to prevent Plaintiff from

withdrawing from representing him and beginning collection activities.

<u>The November 2, 2005 Meeting</u>

Debtor testified that after receiving the tax refund in late October 2005, he called Mr.

Lamar to schedule a meeting to discuss the outstanding fees and starting new litigation.

Debtor testified that he and his wife attended the meeting on November 2, 2005 in Plaintiff's

Atlanta office.[9]  According to Debtor, he asked Mr. Lamar to reduce the bill and Mr. Lamar

---

[8]  Transcript, Sept. 23, 2014, page 46.

[9]  Mr. Gordon was not at this meeting.

refused.  He testified that he asked Mr. Lamar to start the new litigation on a contingency fee

basis and Mr. Lamar refused.  He testified that Mr. Lamar asked about the refund and that

Debtor responded that he had the refund but that it was less than expected.  However, he

testified that he did not tell Mr. Lamar the actual amount of the refund.  He testified that he

then told Mr. Lamar that if he paid the refund to Plaintiff, he would be out of business, but if

he kept the money, he might have a chance at keeping his business going.  Debtor testified,

"And I looked at him and I said, 'So I guess you know what my decision is going to be.'

And my wife and I stood up and we walked out."[10]

Debtor's wife, Mrs. Appling, gave testimony that was generally consistent with

Debtor's version.  She testified that Debtor told Mr. Lamar that he had received the refund

but did not disclose the amount.  At trial she produced a copy, but not the original, of notes

she said she made at the meeting and completed on their drive home.  She said the original

was somewhere in multiple boxes of files and she had found the copy in a box of bills a

couple of months before the trial.  The notes state "I too have to make a business decision &

decide to try to keep the business open as long as I can"[11] which could be interpreted to be

consistent with Debtor's version that he told Mr. Lamar that he was keeping the money.

However, Mrs. Appling testified that Debtor told Mr. Lamar, "...I have to make a business

decision either to keep my business afloat or go bankrupt.  That's what he said.  He never

said he was not going to pay him.  He said, I have to make a business decision, just like you,

Bob Lamar.  I have to decide if I am going to keep my business going and try to keep a roof

---

[10]  Transcript, Sept. 18, 2014, page 172.

[11]  Defendant Exhibit 10.

12

over my family's house, my family–that's the decision I have to make.  He did not say, I'm

not going to pay you."[12]  This testimony suggests that Debtor had not made up his mind on

what he would do with the tax refund, which is contrary to Debtor's testimony.

Mr. Lamar's recollection of the meeting was very different.  Although he testified he

refused the request to reduce the bill and to take on the new litigation, he testified that when

he asked Debtor whether Debtor had received the refund, Debtor said his accountant had not

properly handled the amended tax return, that Debtor had to refile it and that Debtor had not

yet received the refund.  Mr. Lamar testified that Debtor represented he still expected to get

an amount sufficient to recover all of the fees and, based upon that representation, Plaintiff

continued to represent Debtor and did not pursue immediate collection efforts.

Mr. Lamar testified that he did not learn until June 2006 that Debtor had received

and spent the refund money and was not going to pay anything to Plaintiff.  Upon learning

this, Mr. Lamar immediately wrote a letter to Debtor, dated June 26, 2006, recapping the

course of the litigation, reminding Debtor of his promise to use the refund to pay the fees,

stating that Plaintiff had just learned that the refund had been received and spent and

threatening suit if all fees were not paid within fourteen days.  He concluded the letter by

opining that any debt to Plaintiff could not be discharged in bankruptcy due to Debtor's

fraudulent representations.

Debtor responded by letter dated July 19, 2006, in which Debtor complained about

how his case had been handled, the amount of the fees, Plaintiff's refusal to reduce the fees

and Plaintiff's refusal to pursue new litigation.  He then reported in the letter that after the

---

[12]  Transcript, Sept. 23, 2014, pages 95-96.

November meeting, he met with a bankruptcy attorney who recommended that Debtor keep

the money to try to keep the business open.  He further stated "There was nothing fraudulent

on my part in not giving you that refund.  It should be obvious as to what I chose to do since

we are still open."[13]  This suggests that Debtor did not make the decision to keep the refund

until after meeting with the bankruptcy attorney, which is contrary to Debtor's testimony

that he told Mr. Lamar of his decision at the November meeting.

Having heard the evidence, observed the demeanor of the witnesses and reviewed the

documents introduced, the Court finds that Plaintiff has proven by a preponderance of the

evidence that Debtor, with intent to deceive, made an intentional and knowingly false

representation at the November 2005 meeting that he had not yet received the refund.  The

Court does not believe the testimony of Debtor and his wife.  Both Debtor and his wife gave

conflicting testimony as to what Debtor told Mr. Lamar at the November meeting.  The

finding of a copy, but not the original, of the alleged notes from the November meeting

seems suspicious.  Given Debtor's propensity to recount past events in the light most

favorable to his perspective, the Court believes that if he had told Mr. Lamar at the

November meeting that he had received the refund, that it was less than expected, and that

he planned to use it to keep the business open instead of paying Plaintiff, Debtor would have

reminded Mr. Lamar of this in his July 2006 letter.  That he did not do so strongly suggests

that it did not happen.

On the other hand, Mr. Lamar's actions in sending the letter in June 2006, is

consistent with his testimony that Debtor told him at the November meeting that he had not

---

[13]  Plaintiff Exhibit 4.

yet received the refund.  Accordingly, the Court finds Mr. Lamar's testimony more credible.

In addition, the Court finds that Debtor intentionally mislead Plaintiff and committed a false pretense by not disclosing the true amount of the refund at the November meeting. Based on his prior representation at the March meeting, Debtor knew that Mr. Lamar believed the refund was supposed to be approximately $100,000.  Debtor testified he told Mr. Lamar at the November meeting that the refund was less than expected but he did not disclose the actual amount of the refund.  Mr. Lamar testified Debtor continued to represent the refund was sufficient to cover all fees.

The Court does not believe Debtor's testimony.  Given the amount of outstanding fees and that the refund was the sole source of payment, had Debtor told Mr. Lamar that the refund was less than expected, Mr. Lamar would have demanded to know the exact amount so that he could make a decision as to how his firm would proceed.  By failing to disclose that the actual refund was forty percent less than previously represented, and an amount insufficient to pay the outstanding fees owed to Plaintiff and Mr. Gordon, Debtor committed a false pretense.[14]  Once again the intent to deceive is obvious.  By failing to admit that he had received the refund and disclosing that it was significantly less than previously represented, Debtor was again able to avoid Plaintiff terminating its representation and beginning collection activity.

Reliance

---

[14]  Debtor's reliance on the case of Duncan v. Bucciarelli (In re Bucciarelli), 429 B.R. 372 (Bankr. N.D. Ga. 2010) is misplaced.  Bucciarelli did not involve an act of omission. Rather, Bucciarelli involved a promise to pay which the court found the debtor never intended to perform.  Although the Plaintiff here initially made a similar allegation, that allegation was abandoned at trial.  See supra p. 3.

Having determined that Debtor made misrepresentations regarding the tax refund

with intent to deceive, the Court now turns to the reliance requirement.  As this Court

previously held in denying Debtor's motion to dismiss:

> Although section 523(a)(2)(A), by its terms, does not contain a
> reliance requirement, the Supreme Court, in Field v. Mans,
> 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995),
> concluded that Congress intended to adopt the common-law
> meaning of the terms "false pretenses, a false representation,
> or actual fraud" for purposes of section 523(a)(2)(A).  516
> U.S. at 69, 116 S.Ct. at 443.  Therefore, the Court ruled that,
> consistent with common-law requirements, a claim under
> section 523(a)(2)(A) requires "justifiable reliance".  516 U.S.
> at 70-76, 116 S.Ct. at 443-46.
>
> The Court made clear that "justifiable reliance" allows the
> creditor to rely on the representation of the debtor unless there
> are facts known to the creditor that would have alerted him to
> the falsity of the debtor's representation.  Thus, a creditor is
> entitled to rely on the debtor's representation that his property
> is free of liens without first conducting a title search of the
> public real estate records.  516 U.S. at 70, 116 S.Ct. at 444.

Lamar, Archer & Cofrin, LLP v. Appling (In re Appling), 500 B.R. 246, 253 (Bankr. M.D.

Ga. 2013) (footnote omitted).

Mr. Lamar testified that Plaintiff agreed to continue its representation of Debtor and

forego collection activities in reliance upon Debtor's representations regarding the tax

refund.  He testified that with respect to both meetings, had Plaintiff known the truth,

Plaintiff would have immediately withdrawn from the representation, placed an attorney's

lien on Debtor's file and begun collection activities.  There was no evidence to the contrary.

Debtor argues that Plaintiff could not justifiably rely on Debtor's representations

because Plaintiff was fully aware of Debtor's precarious financial condition and had asked

Debtor's mother to assist Debtor in paying the bill.  However, Plaintiff's knowledge of

Debtor's financial condition supports Plaintiff's justifiable reliance.  Plaintiff clearly

believed that the tax refund was the only source of cash Debtor would have to pay the fees.

Plaintiff was aware of no facts which would have led it to doubt its client's representations

about the amount of the refund or the timing of its receipt and, thus, was not on notice to

conduct any further inquiry.  Accordingly, Plaintiff was justified and did rely on Debtor's

representations regarding the tax refund.

<u>Damages</u>

Debtor argues that Plaintiff is only entitled to those damages which arose after the

alleged misrepresentations.  He contends that because his payments after the meetings

exceeded the fees earned, any nondischargeable amount must be significantly less than the

full amount of Plaintiff's claim, much of which is composed of fees earned before the

misrepresentations were made.  However, this Court has already addressed this issue in its

prior decision denying Debtor's motion to dismiss.  As this Court held:

> However, as explained by the court in <u>Foley & Lardner v.
> Biondo (In re Biondo)</u>, 180 F.3d 126 (4th Cir. 1999):
>
>> Through explicit language, Congress provided not only that
>> debts incurred through the direct provision of money,
>> property, or services, but also that the extension, renewal, or
>> refinancing of credit, would fall under the purview of
>> Bankruptcy Code § 523(a)(2)(A)...
>>
>> Section 523(a)(2)(A) covers debts incurred through the direct
>> provision of 'money, property, [or] services.'  As noted above,
>> the primary debtor-creditor relationship is covered by §
>> 523(a)(2)(A) through express language extending its scope to
>> debts incurred through the direct acquisition of value.  <u>See</u> 11
>> U.S.C. § 523(a)(2)(A) (including 'any debt...for money,

17

property, services'). Section 523(a)(2)(A), however, also reaches secondary debt transactions-extensions, renewals, and refinancing...

Our definition focuses on an 'extension' of credit as an autonomous transaction that results in the lengthening of a debtor-creditor relationship. Black's Law Dictionary defines extension as '[a]n allowance of additional time for the payment of debts.' Black's Law Dictionary 583 (6th ed. 1990). In other words, despite the fact that a debt may already be due, the creditor grants a reprieve to the debtor....A extension of credit is analogous to the classic forbearance granted by a creditor in relation to a matured debt. Extensions of credit under 523(a)(2) are thus properly viewed as merely an agreed enlargement of time allowed for payment.

180 F.3d at 131-32.

See Ojeda v. Goldberg, 599 F.3d 712 (7th Cir. 2010) (although original loan not obtained by fraud, extension procured by fraud made entire debt nondischargeable);   Wolf v. Campbell (In re Campbell), 159 F.3d 963 (6th Cir. 1998) (fraudulently obtained extension of a nonfraudulent, dischargeable old debt renders debt nondischargeable even though debt was not collectable at time of extension because debtor was insolvent); Cho Hung Bank v. Kim (In re Kim), 62 F.3d 1511 (9th Cir. 1995) (although original loan was obtained without fraud, extension obtained through false statement made debt nondischargeable even though no new money was advanced at time of extension); Household Finance Corp. v. Greenidge (In re Greenidge), 75 B.R. 245, 247 (Bankr. M.D. Ga. 1987) (Laney, J.) (false representation in connection with renewal or refinancing of credit renders entire debt nondischargeable).

In re Appling, at 254-55.

The Court also rejects Debtor's argument that Plaintiff has failed to show how it could have collected its debt, given Debtor's financial condition. In Wolf v. Campbell (In re Campbell) the Sixth Circuit stated:

18

...Campbell argues that the statutory phrase "to the extent obtained by" requires a creditor to demonstrate in a quantifiable manner that he was further injured because he lost a collection remedy or incurred some other detriment by forbearing. Campbell contends that the Wolfs cannot establish such injury since he was already insolvent when the Wolfs made the extension of credit. In other words, Campbell claims that the Wolfs lost nothing as a result of waiting to pursue collection because they would not have been able to collect from him anyway at the time they decided to forbear.

The Ninth Circuit seems to agree with this argument. It has construed the statute to require the creditor to establish damage through the loss of a valuable collection remedy. But several other circuits have declined to so hold, and we think they have the better side of the argument. *Compare In re Siriani,* 967 F.2d 302, 305 (9th Cir. 1992), *with Matter of McFarland*, 84 F.3d 943, 947 (7th Cir.), *cert. denied,* ---- U.S. -----, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *Matter of Norris*, 70 F.3d 27, 29 n. 6 (5th Cir. 1995); *In re Goodrich*, 999 F.2d 22, 25 (1st Cir. 1993).

We reject Campbell's theory regarding the meaning of the phrase "to the extent obtained by." A contractual "refinancing" or "extension of credit" is sufficient without showing further damage. A creditor need not also show that he could have collected on the loan prior to the bankruptcy but for the new extension of credit. See the thorough discussion of this issue in *Goodrich*, 999 F.2d at 25-26.

. . .

To hold otherwise would create a perverse incentive for insolvent debtors to lie to creditors to get them to forbear collection of past due indebtedness and would remove the primary legal incentive for fair dealing namely, nondischargeability in bankruptcy when a contract is induced by fraud. A borrower's incentive to act with integrity should not end once he becomes insolvent. The bankruptcy law should encourage, not discourage, honesty among contracting parties, especially when there is temptation to lie because of the risk of default.

159 F.3d 963, 966-67 (6th Cir. 1998).

In this case, when the March 2005 meeting occurred, Debtor owed Plaintiff

$60,819.97.  When the November meeting occurred, Debtor owed Plaintiff $58,796.32.

Those fees were due and payable at those times.  As a result of Debtor's misrepresentations,

Plaintiff agreed to continue to represent Debtor and to not withdraw or attempt collection of

the fees.  Thus, Plaintiff gave Debtor an extension with respect to the fees and costs then

due.  This made the entire debt nondischargeable.


**<u>CONCLUSION</u>**

Plaintiff's claim against Debtor of $104,179.60 is nondischargeable pursuant to 11

U.S.C. § 523(a)(2)(A).  An order in accordance with this memorandum opinion will be

entered.

*END OF DOCUMENT*